**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 24-90001** |
| | § | |
| **ACCLIVITY ANCILLARY SERVICES** | § | **CHAPTER 11** |
| **LLC, ET AL.,[1]** | § | |
| | § | **(Jointly Administered)** |
| **DEBTORS** | § | |

**THE UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTORS' SECOND
AMENDED JOINT COMBINED CHAPTER 11 PLAN AND DISCLOSURE
STATEMENT**
[Relates to ECF Nos. 86 and 370]

TO THE HONORABLE MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), hereby submits his objection to Acclivity Ancillary Services LLC and its affiliate debtors' (the "Debtors") *Second Amended Joint Combined Chapter 11 Plan and Disclosure Statement*, ECF No. 86 (the "Second Amended Plan") and any subsequent modifications to the Second Amended Plan, ECF No. 370. In support of his objection to confirmation of the Second Amended Plan, the U.S. Trustee respectfully states the following:

**INTRODUCTION**

1.      The U.S. Supreme Court held that nonconsensual third-party releases are not authorized under the Bankruptcy Code. *Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071, 2074 (2024). Justice Gorsuch, writing for the majority in *Purdue*, stated: "Nothing in what we have said

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Acclivity Ancillary Services LLC (0786) and Acclivity West, LLC (7677). The Debtors' mailing address is 11200 Broadway Street, Suite 2705, Pearland, Texas 77584

should be constructed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan." *Id.* at 2087 (emphasis in original); *see also In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775-76 (Bankr. N.D. Tex. 2007) ("Most courts allow *consensual* nondebtor releases to be included in a plan . . . that are specific in language, integral to the plan, a condition of the settlement, and given for consideration.") (emphasis added). The Supreme Court, however, did not define what constitutes consent, and thus, this Court must determine whether the failure to opt out (silence) in these cases can equate to consent for the purposes of third-party releases.

2.      In these cases, the U.S. Trustee objects to the Second Amended Plan because it impermissibly imposes third-party releases on parties who have not affirmatively and unambiguously demonstrated their consent to grant broad releases of non-debtors. Under the solicitation procedures, creditors that vote to approve the plan but do not opt out are bound by that vote to give third-party releases.  Similarly, parties eligible to vote that abstain from voting and parties that are not even eligible to vote because they are deemed to accept or reject the Second Amended Plan must opt out or be bound by third-party releases. Lastly, parties that vote to reject the plan but do not opt out are also bound by third-party releases. All of these parties who do not opt out—including those who do not even vote on the plan or reject the plan—are deemed by their silence to consent. And, notably, these creditors will not receive mutual releases in return. The Bankruptcy Code does not apply to agreements between nondebtors, and thus state law must govern whether a third-party release is consensual. But under state law, silence does not equate to consent except under limited circumstances not applicable in these cases. Thus, opt-out provisions, like those proposed in the Second Amended Plan, are insufficient to confer consent to a third-party

2

release. Rather, unambiguous affirmative consent is required to make the third-party releases effective under applicable non-bankruptcy law.

3.      The U.S. Trustee further objects to the exculpation provisions in the Second Amended Plan. To the extent that applicable law authorizes exculpation beyond 11 U.S.C. § 1125(e), the Debtors are seeking approval of broad exculpation coverage for the Chief Restructuring Officer (the "CRO") in direct violation of Fifth Circuit law. *See NexPoint Advisors, L.P. v. Highland Cap. Mgmt. L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 437–38 (5th Cir. 2022). The Fifth Circuit, in its decision in *Highland Capital*, again clarified its previous holdings that exculpation coverage under a Chapter 11 plan is limited only to a debtor, an official committee and its members, and also held that in rare circumstances that are not present here that it could also cover independent directors appointed to act as a bankruptcy trustee pursuant to a court order. The Fifth Circuit did not allow exculpation coverage for a Chief Restructuring Officer, which is an officer of the Debtors.

4.      Thus, given the Second Amended Plan's noncompliance with applicable law, the U.S. Trustee respectfully requests that the Court deny confirmation.

### BACKGROUND

5.      On January 21, 2024, the Debtors filed the Second Amended Plan [ECF No. 86].

6.      On January 22, 2024, the Court entered an order conditionally approving the disclosure statement and the solicitation procedures.

7.      On February 26, 2024, the Court approved the employment of W. Marc Schwartz as the CRO for the Debtors [ECF. No. 152].

8.      Articles I.A.48, 102 and 103 of the Second Amended Plan define "Exculpated Parties", "Released Parties" and "Releasing Parties" as follows:

48. "Exculpated Party" and "Exculpated Parties" means each and collectively, and in each case, in its capacity as such: (a) the Debtors, (b) the Creditors' Committee; (c) and each of the Creditors' Committee's members (in their capacities as members of the Creditors' Committee); and (d) the Chief Restructuring Officer.

102. "Released Party" and "Released Parties" means each in its capacity as such: (a) the Debtors; (b) the Reorganized Debtor; (c) the DIP Lender/Plan Sponsor and Bryan Cooper, and, solely with respect to the DIP Lender/Plan Sponsor, the DIP Lender/Plan Sponsor's current and former affiliates and subsidiaries, and such Entities' current and former affiliates' and subsidiaries' current and former officers, directors, managers, officers, equity holders, employees, agents, advisors, attorneys, financial advisors, investment bankers, consultants, representatives, and other professionals, (d) the Creditors' Committee; (e) each of the Creditors' Committee's members (in their capacities as members of the Creditors' Committee); and (f) Debtor's officers and managers (W. Marc Schwartz, Deanna Osborne, Shelley Hill, Jesse Millares).

103. "Releasing Party" and "Releasing Parties" means each in its capacity as such: (a) the Debtors; (b) the Reorganized Debtor; (c) the DIP Lender/Plan Sponsor; and (d) all holders of Claims or Interests who do not opt out of granting the releases set forth in the Plan by returning the opt-out election form to be included with the ballot or notice of non-voting status.

9.      Articles VI.B and C of the Second Amended Plan provide the following with respect to third-party releases and exculpation:

> **Consensual Releases by Holders of Claims and Interests**. Except as provided for in the Plan or Confirmation Order, as of the Effective Date, each Releasing Party (to be a Releasing Party, such party must consensually release the Released Parties pursuant to the opt-out procedures described in the ballots or notice of non voting status) has released and discharged each Released Party from any and all Causes of Action, whether know nor unknown, including any derivative claims, asserted on behalf of the Debtors, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the 2020 Swap, the Prepetition Loan Agreement, the formulation, preparation, dissemination, negotiation, or filing of the Plan, the DIP Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other

occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release obligations of any party or Entity under the Plan, or any document, instrument, or agreement executed to implement the Plan.

**Exculpation.** Except as provided for in the Plan or Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

10. On March 4, 2024, the U.S. Trustee filed an objection to the Second Amended Plan [ECF No. 176].

11. On March 7, 2024, the Debtors filed the *Declaration of Brad Daniel of BMC Group Regarding Voting and Tabulation of Ballots for the Debtors' Second Amended Joint Combined Chapter 11 Plan and Disclosure Statement* (the "Daniel Declaration").

12. The Daniel Declaration provides the following with respect to the number of ballots in each class solicited compared to the number and amount of valid ballots returned:

5

| Plan Class | Impaired Class Description | SOLICITED | | RETURNED | |
|---|---|---|---|---|---|
| | | COUNT | AMOUNT | COUNT | AMOUNT |
| 1 | LOF Secured Claim | 1 | $5,566,450.17 | 1<br>100.00% | $5,566,450.17<br>100.00% |
| 2.A. | 2020 Swap Claims | 625 | $12,849,284.62 | 529<br>84.64% | $11,397,748.26<br>88.70% |
| 2.B. | FLS Interest Claims | 140 | $6,475,265.00 | 132<br>94.29% | $6,251,890.00<br>96.55% |
| 2.B. | General Unsecured Claims | 4 | $4.00 | 4<br>100.00% | $4.00<br>100.00% |
| 2.C. | Florida Claims | 221 | $8,810,384.00 | 116<br>52.49% | $3,963,228.00<br>44.98% |

13. The *Ballot Tabulation Report* attached to the Daniel Declaration also shows that numerous creditors that voted to reject the plan did not return an opt out form. *See* ECF No. 191.

14. On March 22, 2024, the Court denied confirmation of the Second Amended Plan [ECF No. 226].

15. On November 1, 2024, the Debtors filed *Debtors' Modified Second Amended Chapter 11 Plan* and a request to expedite confirmation of the Second Amended Plan with modifications. The Debtors did not address issues raised in the U.S. Trustee's objection filed at ECF No. 176 in the modifications.

16. A hearing to consider final approval of the disclosure statement and confirmation of the Second Amended Plan is scheduled for November 18, 2024, at 1:30 pm.

## **OBJECTION**

17. Section 1129(a) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if it complies with all" requirements of section 1129(a). 11 U.S.C. § 1129(a). The

Bankruptcy Code further requires that the "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Among other requirements, section 1129(a) mandates that "[t]he plan complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1).  The Debtors, as plan proponents, bear the burden of proof with respect to the confirmation requirements by a preponderance of the evidence. *Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown").

18.     Consistent with the requirements set forth in sections 1125(a) and 1129(a), the U.S. Trustee objects to confirmation of the Second Amended Plan because the Debtors have failed to show the requisite affirmative consent from all parties subject to the "consensual" third-party releases in the Second Amended Plan. The procedures by which all creditors must opt out of the release to avoid being bound by it are insufficient to show the affirmative consent required by law. As a result, the Debtors are seeking to impose nonconsensual third-party releases on numerous affected parties without their manifested consent. As the Supreme Court in *Purdue* made clear, the Bankruptcy Code does not permit non-consensual third-party releases.  Similarly, to the extent that applicable law authorizes exculpation beyond 11 U.S.C. § 1125(e), the Second Amended Plan's exculpation provision violates the Fifth Circuit's holding in *Highland*. Therefore, the Debtors cannot show that the Second Amended Plan meets the Bankruptcy Code's requirements for approval.

***A.     The Bankruptcy Code Does Not Authorize Nonconsensual Third-Party Releases.***

19.     Nonconsensual third-party releases are not authorized under the United States Bankruptcy Code.  *Purdue,* 144 S. Ct. at 2082–88.  This has long been the conclusion held by the

Fifth Circuit Court of Appeals. *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions").

20.     As noted above, the Supreme Court in *Purdue* did not decide what constitutes consent to a non-debtor release.  For the reasons discussed below, the failure to check an opt-out box on a ballot does not constitute consent to a non-debtor release in a chapter 11 plan.  Although opt-out provisions have been approved in some cases in the Southern District of Texas, a careful analysis of applicable law warrants reconsideration of the conclusion that imposing non-debtor releases based on a failure to opt out is permissible.  As explained below, state contract law governs whether non-debtors have agreed to a release.  There is no federal law that preempts the requirements of state contract law for such releases.  The cases in this district that have approved non-debtor releases based on a failure to opt out did not apply state law.  Instead, they bound creditors to non-debtor releases based on a failure to opt out because they treated the creditors' silence as a form litigation default or analogized to class actions.  But as explained below, neither of those theories supports disregarding applicable state law.

**B.     *State Law Governs Whether a Release Is Consensual***

21.     Whether parties have reached an agreement—including an agreement to release one's claims against another (*i.e.*, not to sue)—is governed by state law.  The only exception is if there is federal law that preempts applicable state contract law in some specific context.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

22.     No such exception applies here.  There is no federal law that applies to the question of whether the nondebtor Releasing Parties have agreed to release the non-debtor Released Parties. No Bankruptcy Code provision addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor.  And no Bankruptcy Code provision authorizes courts, as part of an order confirming a chapter 11 plan, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where such consent would not otherwise be found to exist as a matter of state law..  Nor does 11 U.S.C. § 105(a) confer any power to override state law.  Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue, L.P.*, 144 S. Ct. at 2082 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).  Thus, the Bankruptcy Code does not change the state-law definition of consent as applicable to claims among non-debtor parties..

23.     Indeed, "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450–51 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").  Thus, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo*

*Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

24.     Many courts have recognized that, because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state-law contract principles serve as controlling authority when considering whether a release is consensual.  *See, e.g., In re Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684–85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (explaining that a third-party release "is no different from any other settlement or contract"); *id*. at 507 (holding that "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  As one court recently held, because "nothing in the bankruptcy code contemplates (much less authorizes it)' . . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent."  *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 144 S. Ct. at 2086).  Accordingly, "any such consensual agreement would be governed by state law." *Id*.

25.     Here, the Debtors do not meet their burden of establishing that the Releasing Parties will affirmatively agree to release their property rights in a manner sufficient to demonstrate consent under state law.

## C.     Under State law, silence does not confer consent in contract, except in limited circumstances not applicable here

26.     The "general rule of contracts is that silence cannot manifest consent." *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 686 (E.D. Va. 2022).

27.     "Acceptance by silence is exceptional.  Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.); *Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("offeror cannot prescribe conditions so as to turn silence into acceptance" ). Instead, under state law, an agreement to release claims—like any other contract—generally requires a manifestation of assent to that agreement. *See* RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration.").

28.     There are only very limited exceptions to that principle.  "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

29.     But absent such extraordinary circumstances,, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  *See also Patterson*, 636 B.R.

11

at 686 (discussing how contract law does not support consent by failure to opt out).  And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id*. § 69, cmt. c.  *See also Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227-28 (9th Cir. 2022) ("[E]ven though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance.") (quotation marks omitted); *Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out).

30.    Texas state law, as a point of reference, is in accord.  Under Texas law, silence does not equate to consent except under limited circumstances not applicable in these cases. *See Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000). Further, the Commission of Appeals of Texas stated that:

> A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services. Of course, in implied contracts as well as express contracts there must be shown the element of mutual agreement. But the only difference is that such agreement is expressly stated, in the one instance, and is inferred from the circumstances, in the other. A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one.

*Marr-Piper Co. v. Bullis*, 1 S.W.2d 572, 575 (Tex. Comm'n App. 1928).

31.    Silence and inaction, however, will generally not be deemed assent to an offer because, with silence, there is no meeting of the minds. *Matagorda Cty.*, 52 S.W.3d at 132–33 (quoting 2 Williston on Contracts § 6:49 (4th ed. 1991)). "[A]s a matter of law, when a party is unilaterally informed of [a contract term], 'mere failure to object within a reasonable time . . .,

without more, could not establish an agreement between the parties.'" *In re Couture Hotel Corp.*, 554 B.R. 369, 381 (Bankr. N.D. Tex. 2016) (quoting *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 665 S.W. 2d 443, 445–46 (Tex. 1982)). "[A] meeting of the minds is an essential element of an implied in fact contract." *Id*. (quoting *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008)) (internal quotation omitted). 2008)); *see also Beverick v. Koch Power, Inc., 186 S.W.3d 145, 152* (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("Silence cannot satisfy the basic requirements of contract creation.").

32.     As the Fifth Circuit explained: "Tacit acquiescence between relative strangers ignores the basic tenets of contract law. . . .  While there may be exceptions in cases involving parties with longstanding relationships, generally speaking, 'silence or inaction does not constitute acceptance of an offer.'"  *Imperial Ind. Supply Co v. Thomas*, 825 F. App'x 204, 207 (5th Cir. Sept. 2, 2020) (quoting *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017)).  As another District Court within this Circuit explained, "[t]his idea that [the plaintiff] can unilaterally bind another party to a contract, however, is contrary to law.  It is a fundamental principle of contract law that to create an enforceable contract, there must be a clear and definite offer followed by a clear and definite acceptance in accordance with the offer's terms." *Redmond v. Williams*, No. 22-cv-00910, 2023 WL 7984388, at *6 (E.D. Tex. Sept. 13, 2023).  Acceptance of an offer "is established only by conforming to the rules governing acceptance, not a separate theory of 'waiver and ratification.'"  *Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1186 (5th Cir. 1981).

**D.     *The Debtors Cannot Impose Releases by Treating a Failure to Opt Out as a Form of Default***

13

33.     Applicable state contract law cannot be disregarded on a procedural default theory, previously applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors because they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so.  In particular, Judge Lopez in *In re Robertshaw US Holding Corp.*, No. 24-90052, 2024 WL 3897812, at \*17 (Bankr. S.D. Tex. Aug. 16, 2024), cited *In re Arsenal Intermediate Holdings, LLC* for the proposition that "there is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan."  As Judge Goldblatt, the author of *Arsenal*, explained in *Smallhold, Inc.*, "[t]he rationale of *Arsenal* was that creditors that did not object to or opt out of a third-party release could essentially be 'defaulted,' with the release being imposed on them, despite their silence, on that basis.*" In re Smallhold Inc.,* No. 24-10267 (CTG), 2024 WL 4296938, at \*8 (Bankr. D. Del. Sept. 25, 2024). But forfeiture principles do not apply to consent, which requires an affirmative manifestation of assent, not a mere failure to object.  As explained in *Smallhold*, "[u]nder established principles," courts may enter relief against a party who defaulted by not responding "*only* after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff in litigation" when actually contested. *Smallhold, Inc.*, 2024 WL 4296938, at \*2 (emphasis added); *see also id*. at \*13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so.").

34.     A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *Id*.  "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the

14

creditor to the judgment." *Id*.  That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties.

35.     Because a nonconsensual nondebtor release is "*per se* unlawful . .  it is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id*. Absent the default theory of consent that was applied in *Arsenal*, Judge Goldblatt reasoned that "no other justification for treating the failure to 'opt-out' as 'consent' to the release can withstand analytic scrutiny." *Id*. Because imposing non-debtor releases is not "appropriate under the ordinary principles that govern when a default may be entered . . . ***affirmative consent is required***." *Smallhold Inc.*, 2024 WL 4296938, at *8 (*emphasis added*).

36.     Judge Goldblatt further illustrated the point with an example of a plan of reorganization that required each creditor who failed to check an "opt-out" box on a ballot was required to make a $100 contribution to the college education fund for the CEO of the debtor. He concluded that "no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution." *Id*.  But none of the cases that imposed a third-party release based merely on a creditor's failure to object or opt out "provides any limiting principle that would distinguish the third-party release from the college education fund plan. And after *Purdue Pharma*, there is none." *Id*. Thus, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Id*. at *10.

37.     Here, the Second Amended Plan provides broad non-debtor third-party releases to numerous known and unknown parties and would also deprive creditors from their legal rights under the pretense of consent. Notably, creditors who are deemed to consent by their silence will

not receive mutual releases in return. *See* Articles I.A.102 and 103. As noted in *Smallhold*, "[t]his Court's application of ordinary and settled legal principles leads it to conclude that there is no longer a legal basis to distinguish a traditional opt-out plan from the college education fund plan, which no bankruptcy court would confirm." *Smallhold, Inc.*, 2024 WL 4296938, at \*15. As such, this Court should not approve the third-party releases in the Second Amended Plan because there is not sufficient evidence of manifested consent from creditors to release with their legal rights against non-debtors.

### E.       *Failing to Opt Out Does Not Provide the Required Affirmative Consent*

38.       An affirmative agreement—something more than the failure to opt out or object— is required to support a consensual third-party release. *See id.*, at \*3 (Sept. 25, 2024) ("[A] creditor cannot be deemed to consent to a third-party release without some affirmative expression of the creditor's consent."); *see also id.*, at \*8; *Patterson*, 636 B.R. at 686; *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222-23 (Bankr. W.D.N.Y. 2024).   Failing to "opt out" of an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits.   For example, applying black letter contract principles to opt-out releases in a chapter 11 plan in *Patterson*, the Court found that contract law does not support consent by failure to opt-out. *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient ***affirmation of consent***." *Id.* at 688. (*emphasis added*).

39.       The Ninth Circuit's decision in *Norcia*, cited by the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), illustrates the point.   In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282.   Among the contents of the phone's box was a

16

Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id*. It also stated that opting out would not affect the warranty coverage. *Id*. The customer did not take any steps to opt out. *Id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *Id*. at 1282–83.

40. As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290. That is even more true in the context of a chapter 11 plan. Not only are the nondebtor Released Parties not signatories to it, a chapter 11 plan is not a contract but a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not for resolving claims between non-debtors. As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors. . . . [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

41. The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. Unsurprisingly—because there was no applicable federal law and the question was not whether one could opt out of a class action—the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000). The customer

17

did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless.  "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id.* at 1286 (quotation marks and citation omitted).

42.     The Ninth Circuit explained that exceptions to this rule exist when the offeree has a duty to respond or when the offeree retains the offered benefits but held neither exception applied.  *Norcia*, 845 F.3d at 1284–85.  There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision.  *Id*. at 1286.

43.     Here, too, the Debtors' creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests acceptance of an offer to release them.

44.     *First*, those voting to accept the plan have not affirmatively consented to a non-debtor release by failing to opt out of that release. Voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors.  See RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

45.     As an initial matter, merely voting to approve a plan is not an expression of consent to a non-debtor release. *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (reaching same conclusion).  As explained in *Arrowmill*, a voluntary release arises only "because the creditor agrees" to it.  211 B.R. at 507 (emphasis in original).  And the "validity of th[at] release" necessarily "hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order." *Id.* (citation and alterations omitted). Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan" in order to destroy its rights under nonbankruptcy law. *Id*. (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998).  Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt." *Arrowmill*, 211 B.R. at 507.

46.     Because merely voting to approve a plan does not manifest consent to a non-debtor release, such a vote plus a failure to opt out is still nothing more than silence with respect to the offer to release claims against non-debtors.  Voting to accept a plan but remaining silent about a non-debtor release by failing to check an opt-out box does not fit within any of the exceptions to the rule that silence is not acceptance of an offer.

47.     Creditors who vote for a plan without opting out of a non-debtor release are not "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  The only benefits received by creditors are distributions from the debtor's chapter 11 plan.  Thus, "[e]ssentially, creditors are

being asked to give releases to third parties for no consideration." *In re Tonawanda Coke Corp.*, 662 B.R. at 222. Because creditors are entitled to whatever distributions the Plan allocates them regardless of whether they opt out of the nondebtor releases—i.e., the non-debtors will not provide creditors any additional benefit for having accepted the release—consent to the nondebtor release cannot be inferred from mere acceptance of the benefits of the debtor's plan. *See Norcia*, 845 F.3d at 1286 (holding that customer's failure to opt out did not imply his consent where warranty applied regardless of failure to opt out, meaning that customer did not thereby obtain any additional benefit). Further, non-debtors have no right to prevent a debtor's creditor from receiving distributions under the debtor's chapter 11 plan, and thus acceptance of those distributions does not manifest acceptance an offer to release non-debtors. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

48. Nor does voting to approve a chapter 11 plan while remaining silent about a non-debtor release "manifest [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a. Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors. Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims against the debtor.

49. And as in *Norcia*, creditors have no state law duty to respond to an offer to release nondebtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released nondebtors that would impose such a duty. *See Norcia*, 845 F.3d at 1285-86. Nor do creditors have any affirmative obligation to act on a plan, either to vote or to opt out. See, e.g., 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison, Inc.*, 576 B.R. at 460–61 (holding creditors have no duty to speak regarding a plan that would allow a court to infer consent from silence). A claimant's vote in favor of a plan while remaining silent regarding a non-debtor release thus does not fit within the exception to the general rule that consent cannot be inferred from silence.

50. *Second*, those voting to *reject* a plan have also clearly not affirmatively consented to a non-debtor release by failing to opt out of it. To the contrary, they have affirmatively rejected the Second Amened Plan. The Ballot Tabulation Report indicates numerous creditors that voted to reject the plan, but nonetheless, will be deemed to "consent" to the third-party releases due to their failure to opt-out of non-mutual third-party releases. It is implausible to suggest that a party returning a ballot rejecting the plan but neglecting to opt out of the third-party release is evidencing consent to the third-party release. Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan.

51. As discussed above, voting on a plan but remaining silent about a non-debtor release by failing to check an opt-out box is not consent. All this is made clearer by the circumstance where a creditor casts his vote on a plan by *rejecting* that plan but neglects, for reasons unknown, to also check an opt out box. In *In re Chassix Holdings, Inc.*, the United States Bankruptcy Court for the Southern District of New York explained why the independent consent

to a third-party release required under contract law cannot be inferred from a vote to reject a chapter 11 plan:

> If (as prior cases have held) a creditor who votes in favor of a plan have implicitly endorsed and 'consented' to third party releases that are contained in that plan, then by that same logic a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. ***The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.***

*In re Chassix Holdings, Inc.*, 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

The United States Trustee recognizes that the court in *Smallhold* found that, in at least some circumstances, the act of voting on a debtor's plan (whether to accept or reject it) combined with a failure to exercise an opt-out option can constitute consent to a non-debtor release. *See Smallhold,* 2024 WL 4296938, at *14. The *Smallhold* decision, however, although stating it was applying "ordinary contract principles," 2024 WL 4296938, at *3, failed to faithfully apply those principles to the question of when silence can constitute consent. For the reasons discussed above, contract principles do not support imputing consent for a third-party release based merely upon a creditor's neglect to exercise an opt-out option and that remains true even when that option is conspicuous or well-advertised.

52.    In *Smallhold*, the court reasoned that consent to a nondebtor release could be understood to exist because the act of voting on a debtor's plan is an "affirmative step" taken after being told that failing to opt out would bind the voter to the nondebtor release. *Smallhold,* 2024 WL 4296938, at *14. But while voting is certainly an "affirmative step" with respect to the debtor's plan, as discussed above, it is not a "*manifestation of intention* that silence may operate as acceptance" of a third-party release. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added). The bankruptcy exists to resolve debtor's liabilities, not those of third parties.

And because, as noted above, creditors have no affirmative obligation to act even as to a debtor's plan, they certainly can have no duty to respond to an offer to release non-debtors of liabilities that exist outside the bankruptcy case entirely. As explained by the Restatement, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction"—in this case, the freedom to vote on a chapter 11 plan—"or impose on him any duty to speak," such as by checking an opt out box or returning an opt out form.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Voting on a plan while failing to opt out thus cannot be equated with affirmative conduct manifesting consent to the nondebtor release.  Just like the hypothetical creditors in *Smallhold* could not be forced to contribute $100 to a college fund to benefit the debtor's CEO's children merely because they failed to return a ballot with an "opt out" box, *Smallhold*, 2024 WL 4296938, at \*2, creditors who cast such a ballot should not be forced to make such a contribution merely because they failed to check that "opt out" box.  State law affords no basis to conclude that consent to release *third-party* claims (which are governed by *nonbankruptcy* law) can properly be inferred from a party's mere failure to check an opt-out box on a ballot expressing its views about the proposed treatment of its claims against the *debtor* (governed by *bankruptcy* law).  As a result, the "general proposition" that *Smallhold* recognized continues to apply: "creditors must *affirmatively express consent to the release* in order to be bound by it."  *Id.* at \*8 (emphasis added); *accord* at \*10 ("[I]t is no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release.").

53.     *Third*, even more obviously, as the Court in *Smallhold* recently held and as courts have held, the releases cannot be imposed on those who do not vote and do not opt out—whether because they abstain from voting or are ineligible to vote. *See Smallhold,* 2024 WL 4296938; *see, also In re Wash. Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) (holding failing to return a ballot

is not a sufficient manifestation of consent to a third-party release"); *SunEdison*, 576 B.R. at 458–61 (holding that, under principles of New York contract law, a creditor could not be deemed to consent to third party releases merely by failing to object to the plan, even when the disclosure statement made it clear that such a consequence would result); *Chassix Holdings*, 533 B.R. at 81–82. An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place). *Wash. Mut.*, 442 B.R. at 355. In either case, the creditor has not manifested affirmative consent to a nondebtor release by failing to return an opt out form or by failing to object to the Plan.

54. Conspicuous warnings in the disclosure statement, the plan ballots, or an opt-out form that silence or inaction will constitute consent to a release are not sufficient to convert a party's silence into consent to the release. *SunEdison*, 576 B.R. at 458–61. In *SunEdison*, the debtors argued that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release. *Id*. at 460–61. The court rejected this argument because the debtors failed to show that the nonvoting creditors' silence was misleading or that the nonvoting creditors' silence signified their intention to consent to the release (finding that silence could easily be attributable to other causes). *Id*. The debtors did not contend that an ongoing course of conduct between themselves and the nonvoting creditors gave rise to a duty to speak. *Id*. at 460.

55. Just as creditors have no federal or state law duty to vote on a plan, they also have no obligation to read a plan. And creditors who have no intention of voting in the first place are unlikely to do so. "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party

24

releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." [2] *Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015). *See also Smallhold, Inc.*, 2024 WL 4296938, at *12 ("It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy.").

56.     Moreover, the court in *SunEdison* observed that parties who are solicited, but do not vote, may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. As the *Emerge Energy Services, LP* court noted, "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as waiver through a party's silence or inaction. No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original).

57.     In addition, Judge Scott W. Everrett in the Northern District of Texas found that because "there are no Federal Bankruptcy Rules or Federal Civil Rules that govern whether or not somebody can assent through silence to a deemed release," courts should look at Texas law to determine whether opt-out provisions are effective to confer consent to a third party. *In re 4 W.*

---

[2] At the confirmation hearing in *Chassix Holdings Inc.*, Judge Wiles explained why courts should be wary of deeming consent based on a party's inaction:

> [I]t's a legal fiction.  It's not consent in any real sense.  It's consent by inaction, knowing perfectly well, that the legal fiction that people have read it and decided, well, I'm just going to abide by this consequence is nonsense.  People throw these things away.  They pay no attention whatsoever, and so the question is, what business do the Courts have basically helping to expand the number of parties who are deemed to consent to these releases.

*Chassix Holdings, Inc.,* Case No. 15-10578 (MEW), ECF No. 654 (Bankr. S.D.N.Y. Jul. 21, 2015), Tr. 158:1-9.

*Holdings, Inc.*, Case No. 18-30777, ECF No. 2086, 6:25–7:3 (Bankr. N.D. Tex. Oct. 18, 2022). In examining Texas state law, Judge Everett held in *4 West Holdings, Inc.* that silence does not equate to consent under Texas contract law and that none of the three exceptions to that principle applied to the opt-out provisions. *Id.* 6:25–7:3, 18:19–20:16. Based on these holdings, the U.S. Trustee submits that evidence of affirmative consent, is required by applicable law for the third-party releases to be effective.

58. Here, the Court should apply state law and should not deem the inaction of abstaining parties to mean that they consent to the broad third-party releases imposed upon them the Second Amended Plan. Accordingly, the Second Amended Plan cannot be confirmed.

**F.    *Opt-Outs in Class Actions are Distinct from Opt-Outs in a Chapter 11 Plan***

59. Judge Lopez in *Robertshaw* referenced opt outs in class actions as vehicle for providing consent. *In re Robertshaw*, 662 B.R. 300, 323 n.120 (Bankr. S.D. Tex. 2024). But the class action rules—Federal Rule of Civil Procedure 23, incorporated by Federal Rule of Bankruptcy Procedure 7023 only for adversary proceedings—by their own terms do not apply here. This is not an adversary proceeding to which Bankruptcy Rule 7023 applies and no one has sought class treatment here. Fed. R. Bankr. P. 7023. Thus, by their own terms, neither Rule 23 nor Bankruptcy Rule 7023 applies.

60. Nor is there any provision in the Bankruptcy Code that would authorize treatment of creditors' claims against non-debtors as a class action. Importantly, "people who fail to respond to class action notices are bound because that is the legal consequence that the Rule specifies, and not on the theory that their inaction is the equivalent of an affirmative joinder in an action." *Chassix Holdings, Inc.*, 533 B.R. at 78. By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, "[t]here is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism." *Id.* Absent a duly enacted statute or federal rule of procedure, a court cannot

unilaterally transplant Rule 23(b)(3)'s class-action "opt out" procedure to bankruptcy proceedings to confirm a chapter 11 plan. Accordingly, federal class action law does not apply and cannot preempt state contract law, which (as discussed above) requires affirmative consent.

61.     Indeed, as the court found in *Patterson*, "the comparison to class action litigation highlights the impropriety of finding releases consensual based merely on a failure to opt out" because in class actions, unlike chapter 11 plan confirmations, "courts must ensure that the class action complies with the unique requirements of Rule 23 of the Federal Rules of Civil Procedure."[3] 636 B.R. at 686. As Judge Goldblatt observed in *Smallhold,* while opt outs are allowed in the class action context, "the critical difference is that in the class action context, a class is only certified after a court makes a factual finding that the named representative is an appropriate representative of the unnamed class member. In the plan context, there is no named plaintiff, found by the court to be an adequate representative, whose actions may presumptively bind others." 2024 WL 4296938, at *12 n.53.

62.     Federal class actions may proceed only after a court certifies that the class meets a series of rigorous procedural requirements designed to ensure the appropriateness and fairness of class-wide litigation.  For any class to be certified, Rule 23(a) requires a court to find: (1) commonality ("questions of law or fact common to the class"); (2) typicality (named parties' claims or defenses "are typical . . . of the class"); and (3) adequacy of representation (representatives "will fairly and adequately protect the interests of the class"). *Amchem Prod., Inc.*

---

[3] Further, "in the class action context there is a public policy that favors the consolidation of similar cases and that justifies the imposition of a rule that binds class members who have not affirmatively opted out." *Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, there is no "general 'public policy' in favor of making third party releases applicable to as many creditors as possible." *Id*.

*v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23); *see id.* at 621 (noting that these standards protect against the variability of equitable justice).

63.     Once those threshold showings are made, Rule 23(b) then requires that one of three further predicates satisfied.  Speaking generally, Rule 23(b)(1) authorizes class treatment where "individual adjudications would be impossible or unworkable," while Rule 23(b)(2) authorizes class actions where "the relief sought must perforce affect the entire class at once."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011).  Rule 23(b)(3), in turn, authorizes class treatment only where a court finds both that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Opt-out procedures are only available in class actions under Rule 23(b)(3), not those under Rule 23(b)(1) and 23(b)(2).  *See Wal-Mart Stores*, 564 U.S. at 362 (explaining that "unlike (b)(1) and (b)(2) classes, the (b)(3) class is not mandatory").

64.     Congressionally approved class action procedures also entail additional procedural safeguards.  A class must be specifically defined to identify the class members and the class claims. Fed. R. Civ. P. 23(c)(1)(B).  Moreover, the court must appoint class counsel that can best "represent the interests of the class."  Fed. R. Civ. P. 23(g).  And for classes certified under Rule 23(b)(3), class members must receive "the best notice practicable" that must "clearly and concisely state in plain, easily understood language:" the nature of the action, who the class is, what their claims or defenses are; their right to appear in the action through an attorney; their right to exclude themselves from the action; how and when to exclude themselves; and the binding nature of the judgment if they do not. In other words, the Federal Rules of Civil Procedure set objective procedural protections before a class can be certified and potential members bound.

65.     Further, "any class settlement that would bind absent class members requires court approval." *Patterson*, 636 B.R. at 686 (citing Fed. R. Civ. P. 23(e)).  And approval may only be granted if, after a hearing, the court finds the settlement is "'fair, reasonable, and adequate' taking into account whether '(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other.'" *Id.* at 687 (quoting Fed. R. Civ. P. 23(e)(2)).  "The inquiry appropriate under Rule 23(e) . . . protects unnamed class members from unjust or unfair settlements affecting their rights." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

66.     None of these protections exist in the context of a non-debtor release in a bankruptcy action." *Patterson*, 636 B.R. at 686.  "[N]o party litigates on behalf of the absent releasing party." *Id.*  And "[n]o party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent releasing party." *Id.*  "Moreover, the absent releasing party does not enjoy counsel that will represent his best interests in his stead."[4]  *Id.*

67.     Finally, in a class action, members that fail to opt out have claims litigated on their behalf, and they may receive whatever proceeds are won in that litigation.  Under a chapter 11 plan with non-debtor releases, although non-debtors may receive a distribution under the plan for their claims against a debtor, non-debtors lose their claims against the non-debtor and any corresponding compensation forever if they (1) are unaware of the release and (2) fail to take affirmative action to opt out or object.  Indeed, if a mere failure to opt out constitutes consent to a

---

[4] Although the official committee of unsecured creditors owes a fiduciary duty to the creditor body as a whole, it does not owe a duty to any individual creditor or any specific group of creditors, and the diverse body of creditors to whom it owes duties often has conflicting interests. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992) (fiduciary duty of individual members of an official committee "extends to the class as a whole, not to its individual members").  Further, the committee's duties relate only to claims against the debtor, not claims against non-debtors.

non-debtor release in bankruptcy, "then no court carries an obligation to ensure the fairness, reasonableness and adequacy of the relief afforded the absent releasing parties." *Patterson*, 636 B.R. at 687.

68.     Notably, state law also provides class-action procedures, with similar procedural protections to federal class actions, in which unnamed class members are bound by a court-approved class settlement unless they opt out. *See* Tex. R. Civ. P. 42. But outside of that class-action context, ordinary contract principles apply, and a person cannot force a contract on someone else by deeming silence, such as a failure to "opt out," to be consent, except in narrow circumstances inapplicable here. *See supra* ¶¶ 11–23.

## G.     The Exculpation Provisions in the Second Amended Plan Violate Fifth Circuit Law

69.     To the extent that applicable law authorizes exculpation beyond 11 U.S.C. § 1125(e), the Plan's exculpation provision is overly broad in violation of Fifth Circuit precedent. The Fifth Circuit in 2022 affirmed that, following its prior decision in *Bank of New York Tr. Co., NA v. Official Unsecured Creditors' Comm.* (*In re Pac. Lumber Co.*) 584 F.3d 229 (5th Cir. 2009), "any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties . . . ." *In re Highland Cap. Mgmt., L.P.*, 48 F.4th at 437 (5th Cir. 2022).

70.     Specifically, the Fifth Circuit in *Highland Capital* analyzed whether the independent directors could be exculpated and reached the following conclusion:

> That leaves one remaining question: whether the bankruptcy court can exculpate the Independent Directors under *Pacific Lumber*. We answer in the affirmative. As the bankruptcy court's governance order clarified, nontraditional as it may be, the Independent Directors were appointed to act together as the bankruptcy trustee for Highland Capital. Like a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee. See 11 U.S.C. § 1107(a); 7 COLLIER ON

BANKRUPTCY ¶ 1101.01. It follows that the Independent Directors are entitled to the limited qualified immunity for any actions short of gross negligence. *See In re Hilal*, 534 F.3d at 501. Under this unique governance structure, the bankruptcy court legally exculpated the Independent Directors.

*In re Highland Cap. Mgmt., L.P.*, 48 F.4th at 437.

71.     The Fifth Circuit in *Highland Capital* thus held that independent directors appointed by the bankruptcy court—under a unique governance structure—to act together as a bankruptcy trustee for Highland Capital were entitled to exculpation.  *Id.* at 437. But in the present case, the Debtors are instead seeking exculpation for the Chief Restructuring Officer ("CRO").  A CRO is not an independent director, and the Debtors did not have the "unique governance structure" requiring the appointment of a bankruptcy trustee.

72.     Instead, the CRO is an officer of the Debtors.  And with respect to whether an officer is entitled to qualified immunity under *Highland Capital*, the Fifth Circuit held that officers—such as the chief executive officer—and the debtor's employees are not entitled to exculpation. To wit:

> As it stands, the Plan's exculpation provision extends to Highland Capital and **its employees and CEO**; Strand; the Reorganized Debtor and HCMLP GP LLC; the Independent Directors; the Committee and its members; the Claimant Trust, its trustee, and the members of its Oversight Board; the Litigation Sub-Trust and its trustee; professionals retained by the Highland Capital and the Committee in this case; and all "Related Persons." Consistent with § 524(e) **we strike all exculpated parties from the Plan except Highland Capital, the Committee and its members, and the Independent Directors.**

*In re Highland Cap. Mgmt., L.P.*, 48 F.4th at 438 (emphasis added).  Accordingly, the CRO cannot be exculpated under the Second Amended Plan.

73.     In addition to specific party limitations, the exculpation provisions must be temporally limited to the period from the Petition Date to the Effective Date. Extending

exculpation coverage outside of these parameters is impermissible and beyond this Court's jurisdiction and is contrary to *Pacific Lumber* and *Highland Capital.* "[O]ur precedent and § 524(e) require any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties 11 U.S.C. § 1103(c), and the trustees within the scope of their duties . . . ." *In re Highland Cap. Mgmt., L.P.*, 48 F.4th at 437 (emphasis added). The Fifth Circuit specifically cited in its opinion parties that can only exist after the petition date and conduct that are within their prescribed "scope of their duties." The Debtors provided no legal basis as to the Court's authority to provide qualified immunity for conduct that occurred prior to the filing of these cases.[5] The exculpation provisions should include a clear temporal limitation so that the scope of the coverage is consistent with the Bankruptcy Code and case law in this circuit. This revision could be accomplished by adding the phrase "from the Petition Date to the Effective Date" to Art. VI.C of the Second Amended Plan.

## CONCLUSION

The Court should not confirm the Second Amended Plan because it will impermissibly impose third-party releases on parties who have not affirmatively and unambiguously consented to broad releases. The Debtors' use of the opt-out provisions in the solicitation materials and Second Amended Plan is insufficient to confer a party's manifested consent to third-party releases and thus the releases violate the Bankruptcy Code and *Purdue*. Further, the exculpation provisions in the Second Amended Plan violate Fifth Circuit precedent. Absent the Debtors showing appropriate consent from all parties affected by the third-party releases in the Second Amended

---

[5] *See, e.g., In re Mallinckrodt PLC*, 639 B.R. 837, 883 (Bank. D. Del. 2022) (exculpation "only extends to conduct that occurs between the Petition Date and the Effective Date."); *In re Fraser's Boiler Serv., Inc.*, 593 B.R. 636, 640 (Bankr. W.D. Wash. 2018) ("Exculpation clauses generally only exculpate those actions taken in connection with a bankruptcy case between the petition date and the effective date of the plan"); *In re Washington Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (exculpation is to cover only "actions in the bankruptcy case"), *citing In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).

Plan and revising the exculpation provisions to comply with the law in this circuit, the Court should

not confirm the Second Amended Plan.

Dated: November 14, 2024,                                    Respectfully submitted,

                                                            KEVIN M. EPSTEIN
                                                            UNITED STATES TRUSTEE


                                                            /s/ Ha M. Nguyen
                                                            Ha Nguyen, Trial Attorney
                                                            CA Bar #305411
                                                            FED ID NO. 3623593
                                                            United States Department of Justice
                                                            Office of the United States Trustee
                                                            515 Rusk Street, Suite 3516
                                                            Houston, Texas 77002
                                                            E-mail: Ha.Nguyen@usdoj.gov
                                                            Cell: 202-590-7962

CERTIFICATE OF SERVICE

        I hereby certify that a true and correct copy of the foregoing *The United States Trustee's Objection to the Debtors' Second Amended Joint Combined Chapter 11 Plan and Disclosure Statement*, was served by electronic means for all Pacer system participants requesting notice on this the 14th day of November 2024.

                                                     /s/ Ha M. Nguyen